NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1126

ADOPTION OF MARREK.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial that spanned three consecutive days, a judge of the Juvenile Court found the mother unfit to assume parental responsibility for her son, Marrek, terminated her parental rights, and approved the Department of Children and Families' (department) proposed adoption plan which provided for adoption by the child's maternal grandmother (grandmother).[2]  The trial judge also found that visits with the mother were in the child's best interests and ordered supervised monthly posttermination and postadoption visits.  Any additional visitation time was left to the sole discretion of the

_____

[1] A pseudonym.

[2] This appeal arises from a second review and redetermination trial held via Zoom on February 22-24, 2022. Following the first review and redetermination trial, held over nonconsecutive days in the summer of 2019, a trial judge found the mother unfit but did not terminate her parental rights. Previously, the mother stipulated to a finding that she was unfit on October 2, 2018.

grandmother, the child's legal custodian.  The mother appeals, arguing that (1) the trial judge's finding of unfitness was erroneous because it relied on stale evidence and was unsupported by clear and convincing evidence, and (2) the trial judge abused her discretion by terminating the mother's parental rights where guardianship was a viable option and the mother's positive trajectory demonstrated the likelihood of her future fitness.  We address each of these arguments in turn and, discerning no error, affirm the decree.

Discussion.  1.  Fitness and termination of parental rights.  The mother first argues that the trial judge failed to properly assess her parental fitness as it existed at the time of trial but instead relied on stale evidence such as her previous mental health challenges and her criminal record.  The argument is unavailing.

"To terminate parental rights to a child and to dispense with consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Bea, 97 Mass. App. Ct. 416, 421-422 (2020), quoting Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  "In determining whether the best interests of the children will be served by issuing a decree dispensing with the

2

need for consent, a court shall consider the ability, capacity, fitness, and readiness of the child's parents . . ." (quotation and citation omitted). Adoption of Jacques, supra. "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Patty, 489 Mass. 630, 637 (2022), quoting Adoption of Ilona, 459 Mass. 53, 59 (2011).

Importantly, although "a finding of current unfitness cannot be based on stale information . . . prior history does have prognostic value." Adoption of Carla, 416 Mass. 510, 517 (1993). Indeed, "[w]here a person's character is itself in issue, as a parent's character generally is in custody or adoption cases, courts have usually held that it may be proved by evidence of specific acts of misconduct bearing on character."[3] Adoption of Irwin, 28 Mass. App. Ct. 41, 43 (1989). Accordingly, there was no error in the trial judge's consideration of the mother's past mental health difficulties

---

[3] The mother argues that the trial judge contradicted her posttrial ruling on the mother's motion in limine by including in the findings two incidents from 2002 and 2003, before the mother became a parent. Assuming without deciding that this was an error, leaving aside these two incidents, the trial judge's decree is still fully supported by the record.

and criminal history[4] as part of the overall assessment of the mother's fitness so long as that conduct spoke to the mother's current fitness.[5]  See id.

Here, sufficient evidence was adduced at trial to support a finding by clear and convincing evidence that the mother was unfit.  The trial judge considered the mother's ongoing and past mental health challenges and concluded that she "remain[ed] mentally unstable in that she [was] unable to demonstrably ascertain when she [was] experiencing a mental health decline and continue[d] to minimize her past behavior/signs of decompensation."

To reach this conclusion, the trial judge relied in part on testimony from a department social worker, who testified that in

---

[4] The mother also argues that the trial judge erroneously considered dispositions on the mother's CARI contrary to the judge's ruling that the mother's CARI would be admissible but "limited to CWOFs and convictions."  However, the trial judge's findings regarding the mother's criminal history largely relied on exhibits 9 and 10, which are records from the Holyoke and Northampton police departments.  The two instances in which the trial judge considered dispositions on the mother's CARI that were not CWOFs or convictions related to two restraining orders, one that was independently supported by the mother's testimony and another that was supported by police department records.

[5] The mother submits that the trial judge could only properly consider evidence after the first review and redetermination trial that concluded on July 10, 2019, where the judge found the mother to be unfit but did not terminate her parental rights.  However, "a judge may rely upon a parent's past conduct . . . so long as that evidence is not the sole basis for the judge's unfitness determination."  Adoption of Luc, 484 Mass. 139, 145 (2020).

4

April 2018 she had to cancel a parent-child visit when the mother grew angry with her after she asked the mother if she was taking her medication. When the social worker attempted to speak with the mother further, the mother "charged" at her but was prevented from taking further action by another staff member. The social worker also testified she observed the mother in a "manic" state on multiple occasions from January 2018 through August 2018, a period of time when the mother would visit the department office without an appointment and would voluntarily divulge previous traumatic experiences to department employees.

Additionally, the trial judge was presented with evidence that the mother was hospitalized three times between 2018 and 2020, including once for a week in January of 2018 when she received inpatient mental health services. In 2019, the mother also entered mental health treatment for four or five days after a conversation with the social worker resulted in the mother agreeing to a mental health evaluation.[6] On September 25, 2020, the grandmother took the mother to the hospital following an argument the mother had with her aunt that resulted in the

---

[6] The mother testified that she only agreed to go to the hospital because the social worker mentioned that she would discuss reunification with the mother if she sought treatment. The mother also admitted, however, that she was being treated in the "psych unit" to regulate her bipolar disorder medication.

mother leaving her aunt's home without a shirt and with her pants on inside out. The grandmother, who arrived at the aunt's home soon after the altercation occurred, testified that the mother appeared "confused" and looked as though she was experiencing a mental health episode. The mother stated that she was not properly dressed because her aunt made her leave the home when she was taking a shower. She also denied experiencing mental health issues during this incident and testified that she was only treated in the hospital for a finger injury. However, the trial judge credited the grandmother's testimony that when the mother arrived at the hospital, she was treated in a mental health unit.[7]

To be clear, the trial judge did not credit a large portion of the mother's testimony throughout the trial, including her testimony regarding the incident on March 18, 2017, that led to the child's removal.[8] The trial judge found that the mother's testimony regarding that incident was "remarkably different"

---

[7] While the mother argues that the grandmother's testimony was self-serving, the trial judge's assessment that the grandmother's testimony was credible is entitled to deference. See Custody of Eleanor, 414 Mass. 795, 799 (1993).

[8] The trial judge also cited the mother's history of domestic disturbances and interpersonal conflicts that remained ongoing after the child's removal and resulted in a numerous instances of police contact. Notably, the trial judge did not credit much of the mother's testimony regarding many of these incidents.

from the records presented by the department and the police and that she continued to downplay the mental health challenges she was experiencing. For example, the mother denied talking to herself or hearing voices telling her to walk away from the police. She further testified that she and the child were outside in the cold weather to view the St. Patrick's Day parade and that they both lacked proper clothing because the child's father threw their jackets into a puddle. The trial judge also did not credit the mother's testimony asserting that when the child's paternal grandmother picked the child up from the police station, the paternal grandmother removed the child's diaper to cover the child in feces, hid supplies that the mother had given her, and called the department to make false reports about the mother.

Furthermore, Dr. Jennifer Laney, a clinical psychologist whom the mother hired to perform a psychological evaluation, testified that the mother engaged in "positive impression management" and that she "probably minimized struggles that she's having." Dr. Laney's also testified that the mother failed to give a full account of her previous drug use or criminal history to Dr. Laney to complete her evaluation.[9]

---

[9] Dr. Laney also performed a substance use screen on the mother that reflected a high probability of substance use disorder. This aligns with the mother's substance use history, which included the use of PCP.

In totality, the mother's lack of candor at trial regarding her previous mental health challenges, including her efforts to blame others and minimize her struggles, supports the trial judge's conclusion that the mother continued to lack insight into her mental health issues and was unable to ascertain when she was experiencing mental health decline.  The mother's three hospitalizations following the removal incident, as well trial testimony from the social worker and the grandmother, supports the trial judge's findings that the mother lacked the temperament or mental stability to provide for the child's needs.  As such, the trial judge's conclusion that the mother remained unfit and that her parental rights should be terminated was supported by clear and convincing evidence.  See Adoption of Bea, 97 Mass. App. Ct. at 421-422.

2.  Adoption plan and the mother's future fitness.  The mother also argues that the trial judge abused her discretion by terminating the mother's parental rights where guardianship was a viable option and the mother's positive trajectory demonstrated the likelihood of her future fitness.  We disagree.

"In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of substantial deference."  Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017) (quotation and citation omitted).  "The best

interests of a child is a question that presents the trial judge with a classic example of a discretionary decision . . . [where] much must be left to the trial judge's experience and judgment." Adoption of Hugo, 428 Mass. 219, 225 (1998) (quotations and citations omitted), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

Here, the trial judge found that the child's need for emotional stability, structure, and routine were all served by adoption by the grandmother, who had provided the child with care and a stable living environment for nearly all of his life. The trial judge also concluded that adoption rather than guardianship would provide the child with needed permanency by preventing the mother from challenging the child's guardianship in the Probate and Family Court as she has done with her two older children who are under the guardianship of the grandmother and who continued to live with the grandmother at the time of trial. Additionally, although the mother has complied with her action plan tasks, as explained above, the trial judge did not err in concluding that the mother's "mental health remain[ed] a significant barrier to reunification," and that she had not significantly benefited from her participation in services. Accordingly, we discern no abuse in discretion in the trial

judge's determination that adoption was in the child's best interests.[10]

Decree affirmed.

By the Court (Rubin,
Desmond & Singh, JJ.[11]),

*Paul Little*

Clerk

Entered:  October 3, 2024.

---

[10] The trial judge also properly evaluated the adoption plan proposed by the department.  See Adoption of Dora, 52 Mass. App. Ct. 472, 474 (2001) (trial judge must review proposed adoption plan before terminating parental rights).

[11] The panelists are listed in order of seniority.